**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL CRUMBLE,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:23-cv-01342** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **UNITED STATES OF AMERICA, <u>et</u> <u>al.</u>,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Currently before the Court is Defendants' motion to dismiss and/or motion for summary judgment relating to the pro se Plaintiff Michael Crumble ("Plaintiff" or "Crumble")'s complaint in which he asserts causes of action against the United States under the Federal Tort Claims Act, 42 U.S.C. § 1346 ("FTCA"), as well as against several employees of Federal Correctional Institution, Schuylkill ("FCI Schuylkill"), in their official and individual capacities, under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), for deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. Also before the Court are Plaintiff's motion to stay this action and motion to appoint counsel. For the reasons set forth below, the Court will: (1) deny Plaintiff's motion to stay; (2) grant Defendants' motion to dismiss the complaint; (3) dismiss without prejudice Plaintiff's FTCA claims against the United States; (4) dismiss without prejudice Plaintiff's Eighth Amendment <u>Bivens</u> claims against Defendants in their official capacities; (5) dismiss with prejudice Plaintiff's Eighth Amendment <u>Bivens</u> claims against Defendants in their individual capacities; (6) deny as moot Defendants' motion for summary judgment; (7) deny as moot Plaintiff's motion to appoint counsel; and (8) decline to provide Plaintiff with leave to file an amended complaint.

## I.     BACKGROUND

On or about May 25, 2023, Crumble commenced this action by filing a complaint and an application for leave to proceed in forma pauperis ("IFP Application") in the United States District Court for the Southern District of New York ("SDNY").  (Doc. Nos. 1, 2.)  On July 21, 2023, Plaintiff's IFP Application was granted.  (Doc. No. 5.)

In his complaint, Crumble named as Defendants: (1) the United States of America; (2) Warden Sage ("Sage"), the Warden of FCI Schuylkill; (3) Ms. Swaboski ("Swaboski"), an "NPC Provider" at FCI Schuylkill; (4) Mr. Steffan ("Steffan"),[1] a Physician's Assistant at FCI Schuylkill; (5) Ms. Loury ("Loury"), a paramedic at FCI Schuylkill; and (6) and Mr. Kubicki ("Kubicki"),[2] a counselor at FCI Schuylkill.  (Doc. No. 1 at 1–2.)  Crumble alleged that in late April 2021, while incarcerated at FCI Schuylkill, he received the second dose of Pfizer's COVID-19 vaccine.  (Id. ¶¶ 2, 5.)  He experienced an allergic reaction to the vaccine and notified the unit officer.  (Id. ¶ 5.)  The unit officer told Crumble that he had to wait for sick call.  (Id.)

Crumble began to experience "red bumps on top of [a] rash," discolored skin, and uncontrollable itching on his face, arms, legs, and back.  See (id. ¶ 6).  Due to these issues with his skin, he could not sleep at night.  (Id. ¶ 7.)

After "to [sic] many days [of] suffering," Crumble was finally called to medical.  See (id.).  While there, Steffan examined Crumble in the presence of another physician's assistant.

---

[1]  In the caption of the complaint, Crumble identifies this Defendant's last name as "Seffen."  See (id. at 1).  According to Defendants, the proper spelling for this Defendant's last name is "Steffan."  See (Doc. No. 25 at 9 & n.1).  The Court will use the proper spelling of this Defendant's last name in this Memorandum.

[2]  Crumble also misspells this Defendant's last name in the caption and body of the complaint. See (Doc. No. 1 at 1–2).  According to Defendants, the proper spelling of this Defendant's last name is "Kubicki," see (Doc. No. 25 at 9 & n.2), which the Court will use in this Memorandum.

(Id. ¶ 8.)  Steffan determined that Crumble "was suffering from anti-Fungal [sic]" and prescribed him Fluconazole to take for seven (7) days.  See (id.).

Crumble took the Fluconazole as prescribed and awakened the next day with his chest swollen.  (Id. ¶ 9.)  In addition, he had red bumps on top of a rash on his skin, discolored skin, itchiness, and sensitive skin.  (Id.)  He believes he was "now having a counter reaction to the" Fluconazole.  See (id.).

In early May 2021, Crumble approached the unit officer because he was seeking medical attention.  (Id. ¶ 10.)  After being denied medical attention for several days, Crumble spoke to a lieutenant, who finally sent him to medical to be treated.  (Id.)  On this occasion, Swaboski treated Crumble.  (Id. ¶ 11.)  Swaboski took pictures of Crumble's chest, arms, legs, and face, and he sent those pictures to Dr. Mace, who was in Philadelphia.  (Id.)  Dr. Mace confirmed that Crumble was experiencing an allergic reaction, ordered Swaboski to administer a steroid injection, and prescribed seven (7) days of oral Prednisone for Crumble.  (Id. ¶ 12.)

The following day, Crumble started to experience lumps on his legs.  (Id. ¶ 13.)  He approached Swaboski to show her the lumps, but she told him that she did not know what was happening to him.  (Id.)  Thereafter, for "month after month," Crumble continued to experience "skin outbreaks," during which his skin was discolored, had rash-like bumps on it, and was very sensitive.  See (id. ¶ 14).  Each time this occurred, Crumble would seek medical attention.  (Id.) However, he was not treated for these issues.  (Id.)

Crumble notes that he could not access the medical staff face-to-face at that time due to COVID-19 restrictions.  (Id. ¶ 15.)  As such, lieutenants, Sage, and the unit manager told him to sign up for sick call.  (Id.)  Crumble continued to submit sick call slips, but he was still never seen.  (Id. ¶ 16.)  He also would approach any members of the medical department that he saw on

his unit, but they met him "with hostility cause [sic] he[ was] complaining to [sic] much."  See (id.).

Among those members of the medical department Crumble encountered was Loury, who he spoke to numerous times about his skin issues.  (Id. ¶ 17.)  Loury told him that she did not "care about [his] conditions," and he should "get the fu** out of her face."  See (id.).  She told him these things despite Crumble only wanting "to see a doctor or specialist who [were] qualify [sic] to treat him."  See (id.).

Thereafter, Loury started to harass him "with pat downs and cell searches."  See (id. ¶ 18).  Even though Loury was "a paramedic [who] work[ed] in medical," she would come into Crumble's housing unit to harass him simply because he continued to seek treatment for his conditions.  See (id.).  Crumble asserts that Loury has been treating inmates at FCI Schuylkill like this for years.  (Id.)

From May until November 2021, Crumble continued to see Swaboski to seek treatment from her, a doctor, or a specialist.  (Id. ¶ 19.)  Yet, Crumble was not treated, diagnosed, or medicated for his issues.  (Id.)  Swaboski told Crumble that she did not know what was wrong with him, and she stated that any request to send him to a hospital would not be approved because it cost too much.  (Id.)

At this point, Crumble started emailing Health Services and Sage.  (Id. ¶ 20.)  He also would "verbally speak" with Swaboski and Sage.  See (id.).  Then, after six (6) "months of suffering," he finally had a Zoom appointment with Dr. Mace in November 2021.  See (id. ¶ 21).  During his appointment with Dr. Mace, Crumble told him about "what he had been enduring since May 2021 after taking [the] Pfizer vaccine."  See (id. ¶ 22).  Crumble tried showing Dr.

Mace his skin through the Zoom camera, but "Dr. Mace could not really see [his] whole body through the screen, so [he] could not accurately diagnose [him]."  See (id.).

After this appointment, Swaboski prescribed Triamcinolone Acetonide cream for Crumble.  (Id. ¶ 23.)  When Crumble used the cream, it burnt his skin.  (Id.)  Crumble told Swaboski about the burning sensation and asked if he could be prescribed something else.  (Id.)  This request "fell on deaf ears for months."  See (id.).  Crumble alleges that he continued to seek treatment from medical, but his requests were met "with hostility."  See (id. ¶ 24).

In January 2022, FCI Schuylkill had a quarantine lockdown which caused Crumble to be stuck in his cell for twenty-four (24) hours a day for thirty-seven (37) days.  (Id.)  His skin continued to itch uncontrollably, and he scratched it so much that it started "blooding [sic]."  See (id.).  His skin was also so sensitive that he could not lie down to sleep.  (Id.)  He complained to "Morning Officer Josh" and "Unit Manager Roup" for over a month.  See (id.).  They ensured him that he would be seen by medical; however, he was never seen.  (Id.)

The situation with the lockdown was mentally draining for Crumble, which caused him to seek psychological help.  (Id. ¶ 25.)  Emotionally, Crumble felt that he had been dealing with something for over nine (9) months, which would not go away, and he felt that medical would not treat his conditions.  (Id.)  He alleges that "psych" diagnosed him with anxiety and depression in November 2022, for which he was prescribed medication.  See (id.).

At some point, Crumble was "finally seen by [a] doctor who was just hired by" FCI Schuylkill.  See (id. ¶ 26).  This doctor prescribed Crumble a Betamethasone Dipropionate ointment, which is a steroid that he could not take for long.  (Id.)  However, Crumble continued to have the same skin issues.  (Id.)

Crumble was transferred to Federal Correctional Institution Otisville ("FCI Otisville"), and while there, he was prescribed oral Prednisone for four (4) days and the Betamethasone Dipropionate ointment in January and April 2023.  (Id.)  These medications have not caused Crumble's conditions to go away.  (Id.)

Based on these factual allegations, the SDNY District Court construed the complaint as asserting:

> (1) claims for damages under the FTCA against the United States of America arising from events alleged to have occurred at both FCI Schuylkill and at FCI Otisville; (2) claims for damages under Bivens against Defendants Sage, Swaboski, S[t]effan, Loury, and Kubic[ki] (who are all allegedly located at FCI Schuylkill), and against individual members of the staff at FCI Otisville; and (3) claims for habeas corpus relief under 28 U.S.C. § 2241 with respect to the execution of Plaintiff's federal sentence in which Plaintiff seeks adequate medical treatment while he is incarcerated at FCI Otisville or his release to home confinement for the purpose of seeking adequate medical treatment at his own expense.

See (Doc. No. 6 at 1–2).  For relief, Crumble sought a declaratory judgment and monetary damages.  (Doc. No. 1 at 8.)

On August 7, 2023, the SDNY District Court issued an Order, which, inter alia, severed Crumble's claims brought under the FTCA against the United States arising from events alleged to have occurred at FCI Schuylkill, as well as his Bivens claims against Sage, Swaboski, Steffan, Loury, and Kubicki, and transferred them to this Court.  (Id. at 2, 12–13.)  Soon after the case was transferred to this Court, Administrative Orders was entered requiring Crumble to either remit the fee or apply for leave to proceed in forma pauperis.  (Doc. No. 9.)  In response to these Administrative Orders, Crumble submitted another in forma pauperis application (Doc. No. 10), which the Court granted on October 11, 2023 (Doc. No. 13).

Defendants waived service (Doc. No. 17) and then filed the instant motion to dismiss and/or summary judgment on December 15, 2023 (Doc. No. 19).  Defendants filed a statement of

6

material facts along with a supporting brief on January 12, 2024.  (Doc. Nos. 24, 25.)  Crumble

never filed a response in opposition to Defendants' motions, despite receiving two extensions of

time to do so.  (Doc. Nos. 29–31.)  He did, however, file a motion to appoint counsel and a

motion to stay the case, both of which the Clerk of Court docketed on April 23, 2024.[3]  (Doc.

Nos. 32–33.)

## II.  LEGAL STANDARDS

### A.  Motions to Dismiss Under Rule 12(b)(1)

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a

factual attack."  Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016).  "A court ruling on a

facial attack considers only the complaint, viewing it in the light most favorable to the plaintiff."

Long v. SEPTA, 903 F.3d 312, 320 (3d Cir. 2018) (citation omitted).  However, a court ruling on

a factual attack, wherein the defendant contests the truth of the jurisdictional allegations, "is a

different matter: the court need not treat the allegations as true[.]"  See id. (citations omitted).

"In reviewing a factual attack, the court may consider evidence outside the pleadings."  Gould

Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citation omitted).  Indeed,

"[b]ecause at issue in a factual 12(b)(1) motion is the trial court's . . . very power to hear the

case[,] there is substantial authority that the trial court is free to weigh the evidence and satisfy

itself as to the existence of its power to hear the case."  See Mortensen v. First Fed. Sav. & Loan

Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In other words, "no presumptive truthfulness attaches

---

[3] Crumble never filed a brief in support of his motion to stay, as required by Local Rule 7.5.  See
M.D. Pa. L.R. 7.5 ("Within fourteen (14) days after the filing of any motion, the party filing the
motion shall file a brief in support of the motion.").  Nevertheless, because Crumble's motion
contained more than three (3) pages of single-spaced typing in which he explained why he was
seeking a stay, and because he is proceeding pro se, the Court will consider the motion and not
deem it withdrawn.  See id. ("If a supporting brief is not filed within the time provided in this
rule the motion shall be deemed to be withdrawn.").

to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  See id.

### B.      Motions to Dismiss Under Rule 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant with notice of the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although this requires a complaint to consist of "only a short and plain statement of the claim showing that the pleader is entitled to relief," see Fed. R. Civ. P. 8(a)(2), a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 312 (3d Cir. 2010).  The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading."  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent dismissal, a complaint must set out "sufficient factual matter" to show that the claims asserted therein are facially plausible.  See id.  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief.'"  See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the district court must: (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).  When following these steps, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

In addition, in the specific context of pro se prisoner litigation, the Court must be mindful that a document filed pro se is "to be liberally construed."  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Higgs v. Att'y Gen., 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)).  Therefore, a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers."  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting Estelle, 429 U.S. at 106).  This means the court must always "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .'"  See Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (quoting Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244–45 (3d Cir. 2013))).  Additionally, when construing a pro se complaint, the court will "apply the relevant

legal principle even when the complaint has failed to name it."  See Mala, 704 F.3d at 244.

However, pro se litigants "cannot flout procedural rules—they must abide by the same rules that

apply to all other litigants."  See id. at 245.

### C.    The Court's Screening of the Complaint Under 28 U.S.C. § 1915(e)(2)

Federal district courts have a continuing screening obligation with respect to actions filed

by prisoners, such as Crumble, who are proceeding in forma pauperis.  See 28 U.S.C. §

1915(e)(2).  This screening requires a district court to "dismiss the case at any time if . . . the

action . . . fails to state a claim on which relief may be granted . . . ."  See id. § 1915(e)(2)(B)(ii)

(emphasis added).  In reviewing legal claims under Section 1915(e)(2), the Court applies the

standard governing motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure.  See, e.g., Smithson v. Koons, No. 15-cv-01757, 2017 WL 3016165, at *3

(M.D. Pa. June 26, 2017) ("The legal standard for dismissing a complaint for failure to state a

claim under . . . § 1915(e)(2)(B)(ii) . . . is the same as that for dismissing a complaint pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure."), report and recommendation adopted,

2017 WL 3008559 (M.D. Pa. July 14, 2017).

### D.    Motions for Summary Judgment

The Court must render summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See

Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson, 477 U.S. at 257.  When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See id. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor.").

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings.  As such, when the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); id. at 328 (White, J., concurring).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted).  Instead, they must produce evidence to show the existence of every element essential to their case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex Corp., 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the burden of proof, "[they] must make a showing sufficient to establish the existence of every element essential to [their] case" (citations omitted)).

As noted <u>supra</u>, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the non-moving party.  <u>See</u> <u>Matsushita</u> <u>Elec. Indus. Co.</u>, 475 U.S. at 588 (citation omitted).  In doing so, the Court must "accept the non-movant's allegations as true and resolve any conflicts in [their] favor."  <u>See</u> <u>White v.</u> <u>Westinghouse Elec. Co.</u>, 862 F.2d 56, 59 (3d Cir. 1988), <u>abrogated on other grounds by</u> <u>Hazen</u> <u>Paper Co. v. Biggins</u>, 507 U.S. 604 (1993).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  <u>See</u> M.D. Pa. L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that they are a pro se litigant because these rules apply with equal force to all parties.  <u>See</u> <u>Mala</u>, 704 F.3d at 245 (noting that pro se parties "cannot flout procedural rules— they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed.  Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'"  <u>See</u> <u>Anchorage Assocs. v.</u> <u>V.I. Bd. of Tax Rev.</u>, 922 F.2d 168, 175 (3d Cir. 1990).  The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection

> with the motion entitle the moving party to judgment as a matter of law.  Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

## III.   DISCUSSION

### A.   Crumble's Motion to Stay

Rather than address the grounds for dismissal and summary judgment outlined in Defendants' moving papers, Crumble filed a motion to stay this case indefinitely, or until such time as he receives a proper diagnosis for his medical condition.  (Doc. No. 33.)  Regarding motions to stay judicial proceedings,

> the power to stay proceedings in incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.  True, the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which [they] pray[] will work damage to some one [sic] else.  Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of each.

See Landis v. N. Am. Co., 299 U.S. 248, 254–55 (1936) (internal citations omitted).  Although federal courts have the inherent authority to stay a case, a stay is an extraordinary measure that is only justified in "exceptional circumstances."  See Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976); see also United States v. Breyer, 41 F.3d 884, 893 (3d Cir. 1994) (explaining that "a stay is an extraordinary measure").  "The proponent of a stay bears the burden of establishing its need."  Clinton v. Jones, 520 U.S. 681, 708 (1997).

In determining whether to stay proceedings, federal courts must carefully balance competing interests.  See Landis, 299 U.S. at 254–55.  Thus, before a stay may be issued, the

13

movant must demonstrate "a clear case of hardship or inequity," if there is "even a fair possibility" that a stay would damage another party.  See Landis, 299 U.S. at 255.  Other considerations include the reasonableness of the length of stay requested and whether the stay would simplify issues and promote judicial economy.  See id. at 256, 257; see also Donald J. Trump for President, Inc. v. Boockvar, 481 F. Supp. 3d 476, 503 (W.D. Pa. 2020) (explaining that when deciding whether to grant a stay, the court considers: "(1) the promotion of judicial economy; (2) the balance of harm to the parties; and (3) the duration of the requested stay").  These factors must be incorporated in the court's ultimate calculus in which it weighs "the benefit and hardship" of staying the proceeding.  See Landis, 299 U.S. at 259.

Here, Crumble does not come close to articulating a compelling reason to stay this action for an indefinite period while he seeks a diagnosis for his alleged ailments that he purportedly has not yet received.  He asserts that he has a disease (without plausible factual allegations to support how he knows he has a "disease") which FCI Schuylkill's medical staff failed to diagnose and treat, simply because the treatment he has received thus far (and the complaint shows that he received treatment) has been allegedly unsuccessful.  He has not, and presumably cannot, state with any level of certainty how long a stay would have to be in place (which is why he is seeking an indefinite stay) while he searches for a doctor to obtain a diagnosis of what ails him.[4]  Moreover, he has not reasonably explained why a stay would simplify issues and promote judicial economy in this case.  Accordingly, the Court will deny Crumble's motion to stay.

---

[4]  Crumble appears to believe that upon his release from prison later this year (Doc. No. 33 at 2), he will quickly find an appropriate medical professional, such as a dermatologist, who will quickly come to an appropriate diagnosis of the issues he experiences with his skin.  While the Court hopes that this is the case, the current state of the healthcare system in the United States makes it highly unlikely.  See, e.g., Tom Murphy, Being a Patient is Getting Harder in a Strained and Complex US Health Care System, Associated Press, June 2, 2024.

**B.** **Defendants' Rule 12(b)(1) Motion to Dismiss Crumble's <u>Bivens</u> Claims Against Them in Their Official Capacities**

Defendants contend that sovereign immunity bars Crumble's <u>Bivens</u> claims against them in their official capacities.  (Doc. No. 25 at 12–13).  The Court agrees.

Sovereign immunity constitutes a jurisdictional bar to claims against the United States and its agencies unless Congress has specifically waived such immunity.  <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.  Sovereign immunity is jurisdictional in nature." (internal citations omitted)); <u>Lewal v. Ali</u>, 289 F. App'x 515, 516 (3d Cir. 2008) (unpublished) ("An action against government officials in their official capacities constitutes an action against the United States [and is] barred by sovereign immunity, absent an explicit waiver." (citations omitted)).  Similarly, sovereign immunity extends to individual officers acting in their official capacities, absent an explicit waiver.  <u>See</u> <u>Treasurer of N.J. v. U.S. Dep't of Treasury</u>, 684 F.3d 382, 395 (3d Cir. 2012)  Thus, "[w]ithout a waiver of sovereign immunity, a court is without subject matter jurisdiction over claims against federal agencies or officials in their official capacities."  <u>See</u> <u>id.</u> (citing <u>United States v. Mitchell</u>, 445 U.S. 535, 538 (1980)).

Congress has not waived the United States and its agencies' sovereign immunity from <u>Bivens</u> claims.  <u>See</u> <u>Bishop v. U.S. Dep't of Homeland Sec.</u>, 648 F. App'x 180, 181 (3d Cir. 2016) (unpublished) ("[T]he District Court correctly determined that it lacked jurisdiction over [the plaintiff's] claims because the agencies' sovereign immunity for <u>Bivens</u> claims has not been explicitly waived by Congress.").  Therefore, sovereign immunity bars Crumble's <u>Bivens</u> claims against Defendants in their official capacities.  <u>See</u> <u>Chinchello v. Fenton</u>, 805 F.2d 126, 130 n.4 (3d Cir. 1986) (explaining that district court properly concluded that plaintiff's <u>Bivens</u> claims against federal employee in the employee's official capacity were barred by sovereign

immunity).  Accordingly, the Court will grant Defendants' motion to dismiss Crumble's <u>Bivens</u>

claims against Defendants in their official capacities under Rule 12(b)(1) for lack of subject-

matter jurisdiction and will dismiss these claims without prejudice.  <u>See</u> <u>Talley v. Attorney Gen.'s</u>

<u>Office</u>, No. 22-cv-01970, 2023 WL 5162052, at *4 (M.D. Pa. July 17, 2023), <u>amended report and</u>

<u>recommendation adopted</u>, No. 22-cv-01970 (M.D. Pa. Aug. 21, 2023), Doc. No. 19.

### C.   Defendants' Rule 12(b)(1) Motion to Dismiss Crumble's FTCA Claim Against the United States

Defendants assert that the Court should dismiss Crumble's FTCA claim for lack of

subject-matter jurisdiction under Rule 12(b)(1).  (Doc. No. 25 at 19–20.)  More specifically, they

assert that this Court lacks subject-matter jurisdiction over Crumble's FTCA claim because he

failed to fully exhaust his FTCA claim before filing his complaint in this case.  (<u>Id.</u>)  Once again,

the Court agrees.

The FTCA is a limited waiver of sovereign immunity and authorizes suits against the

United States

> for injury or loss of property, or personal injury or death caused by the negligent or
> wrongful act or omission of any employee of the Government while acting within
> the scope of his office or employment, under circumstances where the United
> States, if a private person, would be liable to the claimant in accordance with the
> law of the place where the act or omission occurred.

<u>See</u> 28 U.S.C. § 1346(b)(1).  Essentially, the FTCA renders the United States "liable to the same

extent as a private party for certain torts committed by federal employees acting within the scope

of their employment."  <u>See</u> <u>United States v. Orleans</u>, 425 U.S. 807, 813 (1976).  The FTCA "does

not itself create a substantive cause of action against the United States; rather, it provides a

mechanism for bringing a state law tort action against the federal government in federal court."

<u>In re Orthopedic Bone Screw Prod. Liab. Litig.</u>, 264 F.3d 344, 362 (3d Cir. 2001). "The FTCA

only waives sovereign immunity for torts recognized under the law of the state in which the

conduct was alleged to have occurred." Rinaldi v. United States, 904 F.3d 257, 272 n.15 (3d Cir. 2018); see also Meyer, 510 U.S. at 478 (explaining that the "law of the State" is "the source of substantive liability under the FTCA").

As relevant here, a plaintiff must comply with the FTCA's jurisdictional requirements, which are contained in 28 U.S.C. § 2675(a), before filing a FTCA claim in federal court.  Section 2675(a) provides that "[a]n action shall not be instituted upon a claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and [their] claim shall have been finally denied by the agency."  See 28 U.S.C. § 2675(a); see also Shelton v. Bledsoe, 775 F.3d 554, 569 (3d Cir. 2015) ("No claim can be brought under the FTCA unless the plaintiff first presents the claim to the appropriate federal agency and the agency renders a final decision on the claim.").  Thus, "[t]he FTCA contains a jurisdictional bar that requires a plaintiff to file [their] claim with the appropriate federal agency and receive a final denial by that agency before filing a complaint in federal court."  See Banks v. Roberts, 251 F. App'x 774, 776 (3d Cir. 2007) (unpublished) (emphasis added) (citing 28 U.S.C. § 2675(a)); see also Kucera v. United States, No. 21-2133, 2022 WL 1112985, at *2 (10th Cir. Apr. 14, 2022) (unpublished) (affirming district court's dismissal of FTCA claim for lack of subject-matter jurisdiction because plaintiff did not demonstrate that "the agency had finally denied that claim before she filed this action").  A plaintiff's "[f]ail[ure]" to follow this procedure deprives federal courts of subject matter jurisdiction."  See Abulkhair v. Bush, 413 F. App'x 502, 506 (3d Cir. 2011) (unpublished) (citing White-Squire v. USPS, 592 F.3d 453, 456–58 (3d Cir. 2010)).  Furthermore, this exhaustion requirement cannot be waived.  See Roma v. United States, 344 F.3d 352, 362 (3d Cir. 2003) ("In light of the clear, mandatory language of the statute, and [the] strict construction of the limited waiver of sovereign immunity by the United States, . . . the

requirement that the appropriate federal agency act on a claim before suit can be brought is jurisdictional and cannot be waived." (citing Livera v. First Nat'l Bank of N.J., 879 F.2d 1186, 1194 (3d Cir. 1989))).

The plaintiff "must plead administrative exhaustion in an FTCA case." See Guilford v. FCI Williamsburg, No. 22-cv-01945, 2022 WL 2192945, at *2 (E.D. Pa. June 16, 2022).  In addition, the plaintiff "carries the burden of proof to establish presentment of [their] claim to [the agency]." See Medina v. City of Phila., 219 F. App'x 169, 172 (3d Cir. 2007) (unpublished); see also Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) ("The burden of establishing federal jurisdiction rests with the party asserting its existence." (citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 n.3 (2006))).

In this case, Defendants raise a factual challenge this Court's subject-matter jurisdiction insofar as they rely on evidence outside of the complaint in arguing that the Court should dismiss Crumble's FTCA claim.[5]  See (Doc. No. 25 at 19–20).  This evidence includes Crumble's March

---

[5] Although Defendants have raised a jurisdictional challenge, this Court also has the authority to examine subject-matter jurisdiction sua sponte.  See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583–84 (1999) (explaining that courts have independent obligation to determine whether subject-matter jurisdiction exists, even in absence of challenge from any party); Group Against Smog and Pollution, Inc. v. Shenango, Inc., 810 F.3d 116, 122 n.6 (3d Cir. 2016) (explaining that "an objection to subject matter jurisdiction may be raised at any time [and] a court may raise jurisdictional issues sua sponte"); Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 76–77 (3d Cir. 2003) ("[B]ecause subject matter jurisdiction is non-waivable, courts have an independent obligation to satisfy themselves of jurisdiction if it is in doubt. A necessary corollary is that the court can raise sua sponte subject-matter jurisdiction concerns." (internal citation omitted)).  After liberally reviewing the complaint in this case, Crumble has failed to allege that he exhausted his administrative remedies under the FTCA prior to filing his complaint.  Instead, he merely alleges that he "filed a tort claim concerning the pain and injury he suffered mental, physically[, and] emotionally."  See (Doc. No. 1 at 7).  This pleading failure warrants dismissal of his FTCA claim.  See Araj v. United States, No. 22-cv-01455, 2024 WL 3605932, at *7 (M.D. Pa. July 31, 2024) ("FTCA claims should . . . be dismissed for lack of subject matter jurisdiction when the plaintiff's complaint fails to allege that [they] exhausted administrative remedies." (citations omitted)).

20, 2023 administrative tort claim alleging that he sustained an allergic reaction to the COVID-19 vaccine and did not receive treatment for nine (9) months.  See (Doc. No. 24 ¶ 13); see also (id. ¶ 14 (pointing out that Crumble alleged that he sustained "bumps, rash, redness on face, chest, testicles, legs, back and arms," and requested $50,000 in personal injury damages)).  The Northeast Regional Office received Crumble's administrative claim on April 12, 2023, and it acknowledged this receipt by letter dated May 19, 2023.  (Id. ¶ 15.)  Crumble's administrative claim was officially denied on August 28, 2023.  (Id. ¶ 18.)

Considering that Crumble filed his complaint in this case on May 25, 2023 in the SDNY, he had not fully exhausted his administrative remedies prior to filing the complaint.  It is of no moment that Crumble exhausted his claim while this case was pending.  See Holton v. Finley, No. 21-cv-00737, 2021 WL 7186197, at *8 (M.D. Pa. Dec. 30, 2021) ("Holton I") ("The Third Circuit has held that an amended complaint filed after exhaustion does not cure lack of jurisdiction if the original complaint seeking tort damages under the FTCA was filed before exhaustion." (citing Hoffenberg v. Provost, 154 F. App'x 307, 310 (3d Cir. 2005) (unpublished))), report and recommendation adopted, 2022 WL 585148 (M.D. Pa. Feb. 25, 2022); see also Kellom v. Quinn, 86 F.4th 288, 292 (6th Cir. 2023) (explaining that "the [plaintiff] raised its FTCA in court before presenting it to [the agency; t]hus, after exhausting, the [plaintiff] needed to dismiss its original claim and reassert it in a new action"), cert. denied sub nom. Kellom v. United States, 144 S. Ct. 2661 (2024).  Accordingly, the Court will grant Defendants' Rule 12(b)(1) motion to dismiss Crumble's FTCA claim for lack of subject-matter jurisdiction.

**D.** **Defendants' Rule 12(b)(6) Motion to Dismiss Crumble's <u>Bivens</u> Claims Against Defendants in Their Individual Capacities**

Defendants move under Rule 12(b)(6) to dismiss Crumble's Eighth Amendment <u>Bivens</u> claims against them because he presents a new <u>Bivens</u> context and special factors counsel hesitation against granting a <u>Bivens</u> remedy here.  (Doc. No. 25 at 22–30.)  For the reasons stated below, the Court concludes that a <u>Bivens</u> remedy is improper here.

<u>Bivens</u> "provides for private rights of action against federal officials for certain constitutional violations."  See <u>Bryan v. United States</u>, 913 F.3d 356, 358 n.1 (3d Cir. 2019); <u>Murphy v. Bloom</u>, 443 F. App'x 668, 669 n.1 (3d Cir. 2011) (unpublished) ("<u>Bivens</u> recognized a private cause of action to recover damages against federal actors for constitutional violations, similar to the cause of action against state actors provided by 42 U.S.C. § 1983.").  The Third Circuit Court of Appeals recently described <u>Bivens</u> and the relevant analysis for this Court to consider when evaluating the viability of a plaintiff's <u>Bivens</u> claim as follows:

> In certain circumstances, the Constitution affords a cause of action for damages against individual federal officers to redress violations of constitutional rights. <u>Bivens</u>, 403 U.S. at 397, 91 S.Ct. 1999.  "In the case giving the doctrine its name, the Supreme Court held there is a cause of action for damages when a federal agent, acting under color of his authority, conducts an unreasonable search and seizure in violation of the Fourth Amendment."  [<u>Shorter v. United States</u>, 12 F.4th 366, 371 (3d Cir. 2021)] (citing <u>Bivens</u>, 403 U.S. at 389, 397, 91 S.Ct. 1999).  In the decade following <u>Bivens</u>, the Supreme Court recognized two additional causes of action under the Constitution: first, for a congressional staffer's gender discrimination claim under the Fifth Amendment, see <u>Davis v. Passman</u>, 442 U.S. 228, 244, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment, see [<u>Carlson v. Green</u>, 446 U.S. 14, 19, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); <u>Egbert v. Boule</u>, 596 U.S. 482, 490–91, 142 S.Ct. 1793, 213 L.Ed.2d 54 (2022)].
>
> Since then, the Supreme Court has "consistently refused to extend <u>Bivens</u> liability to any new context or new category of defendants," <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), and "has not implied additional causes of action under the Constitution," <u>Egbert</u>, 596 U.S. at 491, 142 S.Ct. 1793.  Instead, in recognition that separation of powers principles are central to the analysis, the Court has "made clear that expanding the <u>Bivens</u> remedy is now

20

a 'disfavored' judicial activity." [Ziglar v. Abbasi, 582 U.S. 120, 135, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017)] (quoting Iqbal, 556 U.S. at 675, 129 S.Ct. 1937). At bottom, the "question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" Id. (quoting Bush v. Lucas, 462 U.S. 367, 380, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)).  "The answer most often will be Congress," id., as the "Judiciary's authority to do so at all is, at best, uncertain," Egbert, 596 U.S. at 491, 142 S.Ct. 1793. The Constitution entrusts the legislature—not the courts—with the power to fashion new causes of action.  And "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." Abbasi, 582 U.S. at 133, 137 S.Ct. 1843.  Therefore, when considering whether to recognize a new implied cause of action for damages under a constitutional provision, "our watchword is caution." [Hernandez v. Mesa, 589 U.S. 93, 101, 140 S.Ct. 735, 206 L.Ed.2d 29 (2020)].

Reflecting these concerns, the Supreme Court has set forth a two-step inquiry to determine the availability of Bivens remedies in a particular case.  See Abbasi, 582 U.S. at 139–40, 137 S.Ct. 1843.  First, we ask whether the "case presents a new Bivens context"—i.e., whether the "case is different in a meaningful way from previous Bivens cases decided by" the Supreme Court.  Id. at 139, 137 S.Ct. 1843. Only three cases serve as a benchmark: Bivens, Davis, and Carlson.  "And our understanding of a 'new context' is broad."  Hernandez, 589 U.S. at 102, 140 S.Ct. 735.

While the Court has not outlined "an exhaustive list of differences that are meaningful enough to make a given context a new one," factors to be considered include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Abbasi, 582 U.S. at 139–40, 137 S.Ct. 1843.  "If a case does not present a new Bivens context, the inquiry ends there, and a Bivens remedy is available."  Shorter, 12 F.4th at 372.

Alternatively, if the case presents a new context, we proceed to the second step of the inquiry and ask whether there are "special factors counselling hesitation" in extending Bivens.  See Abbasi, 582 U.S. at 136, 137 S.Ct. 1843.  The focus at this second step is "on whether the Judiciary is well suited, absent congressional action

or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Id. At this stage, two factors are "particularly weighty: the existence of an alternative remedial structure and separation-of-powers principles." Bistrian v. Levi, 912 F.3d 79, 90 (3d Cir. 2018) (citing Abbasi, 582 U.S. at 136, 137 S.Ct. 1843). But any reason to pause is sufficient to forestall a Bivens extension. Hernandez, 589 U.S. at 102, 140 S.Ct. 735.

Kalu v. Spaulding, — F.4th —, No. 23-1103, 2024 WL 3884268, at *5–6 (3d Cir. Aug. 21, 2024).

With this recent guidance by the Third Circuit, the Court turns to the issue of whether Crumble's Bivens claim presents a new context, and, if so, whether any special factors counsel against extending a Bivens remedy to his case.

### 1.    New Context

Crumble asserts Bivens claims against Defendants in their individual capacities for violations of his Eighth Amendment rights in connection with the allegedly inadequate medical care he received for his skin issues following his receipt of the second dosage of a COVID-19 vaccine while at FCI Schuylkill. (Doc. No. 1 at 3–8.) In deciding whether Crumble's Bivens claims present a new context, the Court must consider whether this case is "different in a meaningful way from previous Bivens cases decided" by the Supreme Court. See Abbasi, 582 U.S. at 139.

Initially, the Court points out that Crumble's Bivens claims are dissimilar to Bivens itself, which was a Fourth Amendment "claim against FBI agents for handcuffing a man in his own home without a warrant," and Davis, which was a Fifth Amendment "claim against a Congressman for firing his female secretary . . . ." See id. at 140 (citations omitted). However, Crumble's Bivens claim bears some resemblance to Carlson.

In <u>Carlson</u>, the factual allegations of the plaintiff's Eighth Amendment <u>Bivens</u> claim were as follows:

> At the time of his death on August 15, 1975, Joseph Jones, Jr. was a prisoner in the federal penitentiary at Terre Haute, Indiana, serving a ten-year sentence for bank robbery. He had been diagnosed as a chronic asthmatic in 1972 when he entered the federal prison system. In July 1975, the prisoner's asthmatic condition required hospitalization for eight days at St. Anthony's Hospital in Terre Haute. Despite the recommendation of the treating physician at St. Anthony's that he be transferred to a penitentiary in a more favorable climate, Jones was returned to the Terre Haute prison. There he was not given proper medication and did not receive the steroid treatments ordered by the physician at St. Anthony's.
>
> On August 15 Jones was admitted to the prison hospital with an asthmatic attack. Although he was in serious condition for some eight hours, no doctor saw him because none was on duty and none was called in. It was further alleged that defendant Dr. Benjamin De Garcia, the chief medical officer directly responsible for the prison medical services, did not provide any emergency procedure for those times when a physician was not present. As time went on Jones became more agitated and his breathing became more difficult. Although Jones' condition was serious, defendant Medical Training Assistant William Walters, a nonlicensed nurse then in charge of the hospital, deserted Jones for a time to dispense medication elsewhere in the hospital. On his return to Jones, Walters brought a respirator and attempted to use it despite the fact that Walters had been notified two weeks earlier that the respirator was broken. After Jones pulled away from the respirator and told Walters that the machine was making his breathing worse, Walters administered two injections of Thorazine, a drug contraindicated for one suffering an asthmatic attack. A half-hour after the second injection Jones suffered a respiratory arrest. Walters and Staff Officer Emmett Barry brought emergency equipment to administer an electric jolt to Jones, but neither man knew how to operate the machine. Jones was then removed to St. Francis Hospital in Terre Haute; upon arrival he was pronounced dead.

<u>Green v. Carlson</u>, 581 F.2d 669, 670 (7th Cir. 1978), <u>aff'd sub nom.</u>, <u>Carlson</u>, 446 U.S. at 24.

Like the plaintiff in <u>Carlson</u>,[6] Crumble is a federal prisoner seeking a remedy for the alleged violation of his Eighth Amendment right to adequate medical care. While the Court does not discount any discomfort, pain, or emotional distress Crumble may have suffered during his

---

[6] As discussed more <u>infra</u>, the plaintiff was decedent's mother, who was administratrix of his estate. <u>See</u> <u>id.</u>

time at FCI Schuylkill, there are material differences between the facts of this case and those in Carlson.  First, and most significantly, "the injuries at issue are distinguishable from Carlson in both nature and severity."  See Holton v. Finley, No. 21-cv-00737, 2024 WL 1919238, at *9 (M.D. Pa. Mar. 21, 2024) ("Holton II"), report and recommendation adopted, 2024 WL 1913172 (M.D. Pa. May 1, 2024); see also Bettis v. Grijalva, No. 21-cv-07505, 2023 WL 4141869, at *6 (S.D.N.Y. June 23, 2023) ("Courts have routinely found [that] variances in circumstances and severity render deliberate indifference claims different from Carlson and thus arise in a 'new context.'" (citing cases)).  Carlson involved an inmate with a pre-existing and chronic respiratory illness, and "it was apparent to medical staff that the inmate was suffering from severe and life-threatening symptoms during an asthma attack."  See Holton II at *9.  These severe and life-threatening symptoms ultimately resulted in the inmate's death.  See Carlson, 446 U.S. at 16 n.1. In this case, Crumble alleges that he had an allergic reaction to a second dose of a COVID-19 vaccine, then had a brief medical issue with the medication initially prescribed for his skin issues, and later received a cream for his issues that unfortunately felt like it burnt his skin. (Doc. No. 1 at 3–7.)  While Crumble alleges that he experienced pain, discomfort, itchiness, and difficulty sleeping, his medical issues were thankfully not fatal, and he does not allege that they were remotely close to life-threatening.  See (id.); see also Washington v. Fed. Bureau of Prisons, No. 16–cv–03913, 2022 WL 3701577, at *5 (D.S.C. Aug. 26, 2022) ("Plaintiff's Bivens claims do not involve a medical emergency, as did Carlson, but rather focus on a long term and ongoing course of medical treatment of [p]laintiff's chronic, non-fatal condition.").

Second, Crumble's allegations in the complaint show that he received medical attention well beyond what the decedent received in Carlson.[7]  In Carlson, the inmate never received competent medical care.  While Crumble alleges that there was "to [sic] long" of a delay in his initial receipt of medical care after developing a reaction to the vaccine, which occurred during the midst of the COVID-19 pandemic, he did not face life-threatening conditions prior to Steffan examining him, determining what ailed him, and prescribing him Fluconazole.  (Doc. No. 1 ¶¶ 7–8.)  When the Fluconazole was allegedly ineffective, Crumble saw Swaboski, who took pictures of Crumble's skin condition and sent those pictures to Dr. Mace, who was offsite.  (Id. ¶¶ 10–11.)  Dr. Mace allegedly determined that Crumble had experienced an allergic reaction, so he had Swaboski administer a steroid injection, and prescribed Prednisone for Crumble to take over the next seven (7) days.  (Id. ¶ 12.)

While it is unclear from the complaint about how effective the steroids were for his skin ailments, Crumble alleges that he experienced the itchiness and pain on his skin for "month after month" and did not receive medical treatment for his requests until he saw Dr. Mace again in November 2021.  (Id. ¶¶ 14–21.)  During that medical visit, Crumble was prescribed Triamcinolone Acetonide cream, which apparently burnt his skin.  (Id. ¶¶ 22–23.)  Thereafter, it does not appear from the allegations in the complaint that Crumble received medical assistance for his skin (although he did receive psychological care) until seeing a new doctor at FCI Schuylkill.  (Id. ¶¶ 24–26.)  Overall, while Crumble includes allegations regarding delays in care,

---

[7]  The Court limits the analysis here to Crumble's allegations in the complaint.  Nevertheless, Defendants' statement of facts and the attached medical records show that, contrary to his allegations in the complaint, Crumble received routine medical attention at FCI Schuylkill for his complaints relating to his skin and health generally.  See (Doc. No. 24 at ¶¶ 19–50; Doc. 24-2 at 2, 27–310).

and allegations that the care he received was allegedly ineffective, he received far more care than the inmate in Carlson.

Third, and finally, the action in Carlson was initiated by the deceased inmate's estate, whereas Crumble commenced the instant action pro se. See 446 U.S. at 16 n.1. As such, the BOP's administrative remedy program available to Crumble at FCI Schuylkill was unavailable to the inmate's estate in Carlson. See Holton II at *9 (finding distinction between Carlson and the case at issue because "the administrative remedy program available to Plaintiff in the prison was not available to the inmate's estate in Carlson"); Washington, 2022 WL 3701577, at *5 (explaining that the difference between the status of the plaintiff in Carlson and the plaintiff in the case before the court was "significant for multiple reasons, including that administrative and injunctive relief would have a completely different application to [p]laintiff's claims than to the claims in Carlson").

Therefore, while the "right at issue" (i.e., the Eighth Amendment) and the alleged "mechanism of injury" (i.e., the failure to provide adequate medical care) are the same in this case as in Carlson, the Court concludes that Crumble's case would extend Carlson to a new context. See Abbasi, 582 U.S. at 139 (explaining that even claims which challenge the failure to provide medical treatment can involve the same "right at issue" and "mechanism of injury" as Carlson, but still have "different" contexts (citing Malesko, 534 U.S. at 64, 70, and n.4)); see also id. at 147 (instructing that "even a modest extension is still an extension" of Bivens). Because Crumble's claim presents a new Bivens context, and the Court now proceeds to the second step of the analysis.

### 2.      Special Factors

In addition to the factual differences between Carlson and the instant case, the Supreme Court has "explained that a new context arises when there are 'potential special factors that previous Bivens cases did not consider.'"  See Egbert, 596 U.S. at 492 (quoting Abbasi, 582 U.S. at 140).  As discussed below, the Court concludes that there are special factors here which counsel against extending a Bivens remedy to Crumble's case.  In addition, these special factors were not considered by the Carlson Court, which further supports the Court concluding that Crumble's case presents a new context.  See Abbasi, 582 U.S. at 148 (instructing that "a case can present a new context for Bivens purposes . . . if there are potential special factors that were not considered in previous Bivens cases" (citation omitted)); see also Egbert, 596 U.S. at 492 (acknowledging overlap between the two (2)-part inquiry insofar that the two (2) parts "often resolve to a single question[,]" i.e., "whether there is any reason to think that Congress might be better equipped to create a damages remedy").

As explained by the Supreme Court, a special factor suggests that Congress is better equipped than the judiciary to "weigh the costs and benefits" of creating a new damages remedy.  See Egbert, 596 U.S. at 492 (citation and internal quotation marks omitted).  If "there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed[,]'" then the Court cannot imply a cause of action for damages under Bivens.  See id. at 496 (emphasis in original) (citation and internal quotation marks omitted).

Here, there are several special factors that weigh against extending a Bivens remedy to Crumble's claim for alleged violations of his Eighth Amendment rights.  First, as briefly mentioned above, an alternative remedial mechanism existed for Crumble, which "independently

foreclose[s] a <u>Bivens</u> action here." <u>See</u> <u>Egbert</u>, 596 U.S. at 497.  More specifically, the BOP's
Administrative Remedy Program, which allows federal inmates to seek review of an issue related
to "any aspect" of their confinement, provided an alternative process for addressing Crumble's
claims.  <u>See</u> 28 C.F.R. § 542.10(a) (providing that "[t]he purpose of the Administrative Remedy
Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her
own confinement"); <u>see also</u> <u>Malesko</u>, 534 U.S. at 68 (holding that "administrative review
mechanisms" can provide "meaningful redress and thereby foreclose[] the need to fashion a new,
judicially crafted cause of action[,]" even if those mechanisms do not "fully remedy the
constitutional violation"); <u>Egbert</u>, 596 U.S. 497 (explaining that "court[s] may not fashion a
<u>Bivens</u> remedy if Congress already has provided, or has authorized the Executive to provide, an
alternative remedial structure" and that, "[i]f there are alternative remedial structures in place,
that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a
new <u>Bivens</u> cause of action" (citation and internal citations and quotation marks omitted)).
Accordingly, "when alternative methods of relief are available," as they were here, "a <u>Bivens</u>
remedy usually is not." <u>See</u> <u>Abbasi</u>, 582 U.S. at 145.

Second, "the Judiciary is not undoubtedly better positioned than Congress to authorize a
damages action" in the context of medical care in federal prisons.  <u>See</u> <u>Egbert</u>, 596 U.S. 492.
The Supreme Court has generally acknowledged that "courts are ill equipped to deal with the
increasingly urgent problems of prison administration and reform[,]" that "[r]unning a prison is
an inordinately difficult undertaking that requires expertise, planning, and the commitment of
resources, all of which are peculiarly within the province of the legislative and executive
branches of government[,]" and that this "task that has been committed to the responsibility of
those branches, and separation of powers concerns counsel a policy of judicial restraint." <u>See</u>

Turner v. Safley, 482 U.S. 78, 84–85 (1987) (emphasis added) (internal citation and internal quotation marks omitted).  Thus, extending a Bivens remedy to this new context "would step well into the lawmaking privilege delegated only to Congress, and well over the bounds of [the Court's] limited constitutional power."  See Mammana v. Barben, 856 F. App'x 411, 415 (3d Cir. 2021) (unpublished) (setting forth this principle in the context of a Bivens claim based upon allegedly unconstitutional conditions of confinement in violation of the Eighth Amendment).

Third, Congress's enactment of the Prison Litigation Reform Act ("PLRA") warrants hesitation in extending Bivens to Crumble's claims.  Indeed, "[s]ome 15 years after Carlson was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court."  See Abbasi, 582 U.S. at 148 (citing 42 U.S.C. § 1997).  As a result, Congress "had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs[,]" but deliberately chose to "not provide for a standalone damages remedy against federal jailers."  See id. at 149.  This legislative action, which "suggest[s] that Congress does not want a damages remedy[,] is itself a factor counseling hesitation" against extending a Bivens remedy to Crumble's case.  See id. at 148; see also Davis v. Samuels, 962 F.3d 105, 112 (3d Cir. 2020) (stating that "Congress's post-Bivens promulgation of the [PLRA]" suggests that Congress does not want a damages remedy).

Along with these special factors, the Court must follow the reasoning of Abbasi that "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others."  See Abbasi, 582 U.S. at 136.  Indeed, while "[i]t is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations[,] the decision to recognize a damages remedy

requires an assessment of its impact on governmental operations systemwide." See id.  Such an assessment "include[s] the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." See id.  These concepts "may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case." See id. at 136–37.

Based on the above, the Court concludes that special factors counsel hesitation in extending a Bivens remedy to Crumble's claims against Defendants in their individual capacities for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.  See Egbert, 596 U.S. at 496 (stating that, if "there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed[,]'" then the court cannot imply a cause of action for damages under Bivens (emphasis in original) (citation and internal quotation marks omitted)).  Additionally, while the instant case and Carlson both involve Eighth Amendment claims of inadequate medical care in the federal prison context, "these superficial similarities are not enough to support the judicial creation of a cause of action."  See id. at 495 (explaining that "almost parallel circumstances" or "superficial similarities" with Bivens, Davis, and Carlson "are not enough to support the judicial creation of a cause of action" (citation and internal quotation marks omitted)); see also Abbasi, 582 U.S. at 149 (stating as follows: "[g]iven this Court's expressed caution about extending the Bivens remedy, . . . the new-context inquiry is easily satisfied"); Braxton v. United States, No. 23-cv-00089, 2023 WL 4166094, at *6 (M.D. Pa. June 23, 2023) (concluding that the federal prisoner's Eighth Amendment Bivens claim presented a new context where his complaint alleged

that the medical defendant was deliberately indifferent in failing to diagnose him with multiple myeloma). Accordingly, the Court declines to extend a <u>Bivens</u> remedy to Crumble in the circumstances presented in his complaint.[8]

### E.   Defendants' Motion for Summary Judgment on Crumble's <u>Bivens</u> Claims Against Defendants in Their Individual Capacities

Along with their motion to dismiss Crumble's Eighth Amendment <u>Bivens</u> claims, Defendants moved for summary judgment on these claims. Although the Court has already determined that Crumble's Eighth Amendment <u>Bivens</u> claims are subject to dismissal, the Court addresses Defendants' motion for summary judgment for sake of completeness. As explained below, even if the Court had determined that a <u>Bivens</u> remedy was available to Crumble on his Eighth Amendment claims against Defendants in their individual capacities, his claims would not have proceeded further because the Court would have granted Defendants' motion for summary judgment on these claims based on his failure to exhaust his administrative remedies.

### 1.   The Exhaustion Requirement

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." <u>See</u> 42 U.S.C. § 1997e(a). In other words, exhaustion

---

[8] Because a <u>Bivens</u> remedy is unavailable to Crumble in this case, the Court has not addressed Defendants' other arguments for dismissal in their motion to dismiss, namely, (1) Crumble failed to state a plausible claim for deliberate indifference, (2) Crumble failed to sufficiently allege the personal involvement of Sage, Loury, and Kubicki in his <u>Bivens</u> claims, and (3) the individual Defendants are entitled to qualified immunity. (Doc. No. 25 at 22–30.) Additionally, the Court notes that it is unclear from the complaint whether Crumble attempted to assert a First Amendment retaliation claim against Loury for harassing him as well as subjecting him to pat-downs and cell searches. <u>See</u> (Doc. No. 1 ¶ 18). Even if Crumble attempted to assert this claim, it would be dismissed because "there is no <u>Bivens</u> action for First Amendment retaliation." <u>See</u> <u>Egbert</u>, 596 U.S. at 499.

of available administrative remedies is a prerequisite for a prisoner asserting a claim under federal law regarding their prison conditions.  See Rinaldi, 904 F.3d at 265; see also Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted) (alteration added)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'"  Downey v. Pa. Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting Woodford, 548 U.S. at 88).  "These applicable procedural rules are supplied by the individual prisons."  Id. (citations omitted); see also Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); Jones, 549 U.S. at 218 (explaining that [t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); Woodford, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").

A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims.  See Spruill, 372 F.3d at 230–32 (concluding that PLRA's exhaustion

requirement includes procedural default component); see also Drippe v. Tobelinski, 604 F.3d

778, 781 (3d Cir. 2010) (pointing out that Spruill held "that the PLRA includes a procedural

default component and the determination whether a prisoner properly exhausted a claim is made

by evaluating compliance with the prison's specific grievance procedures").  A procedural

default may be excused, however, if the prisoner can show that the administrative remedies were

unavailable to them.  See Rinaldi, 904 F.3d at 266 ("The PLRA requires only 'proper

exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting

Woodford, 548 U.S. at 93)).  "An administrative remedy is unavailable when it 'operates as a

simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or

when prison administrators thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation.'" Downey, 968 F.3d at 305 (alterations in

original) (quoting Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)).

   The failure to exhaust available administrative remedies "is an affirmative defense under

the PLRA."  See Jones, 549 U.S. at 216.  As such, "[t]he burden to plead and prove failure to

exhaust as an affirmative defense rests on the defendant."  See Rinaldi, 904 F.3d at 268 (citing

Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)).  However, "once the defendant has established

that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show

that such remedies were unavailable to [them]."  See id. (citation omitted).

   Finally, requiring a prisoner to exhaust available administrative remedies before filing

suit in federal court advances the policy justifications of the PLRA, i.e., to "return[] control of

the inmate grievance process to prison administrators, encourag[e] the development of an

administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e]

the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits."  See

<u>Downey</u>, 968 F.3d at 305 (citation and internal quotation marks omitted); <u>Jones</u>, 549 U.S. at 204 (explaining that exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court").  It also "reduces any incentive that prison officials otherwise might have to use threats to prevent inmates from exhausting their administrative remedies and thereby safeguards the benefits of the administrative review process for everyone."  <u>See</u> <u>Rinaldi</u>, 904 F.3d at 268 (citation and internal quotation marks omitted).

### 2.    The BOP's Administrative Remedies

The BOP has a multi-step administrative remedy program allowing an inmate "to seek formal review of an issue relating to any aspect of his/her own confinement."  <u>See</u> 28 C.F.R. § 542.10(a).  First, an inmate should attempt informal resolution of the issue with the appropriate staff member.  <u>See</u> <u>id.</u> § 542.13(b).  If informal resolution is unsuccessful, the inmate may submit a formal written grievance, using the BP-9 form, to the warden of the correctional facility within twenty (20) calendar days "following the date on which the basis for the Request occurred."  <u>See</u> <u>id.</u> § 542.14(a).  The warden is to respond to the request within twenty (20) calendar days.  <u>See</u> <u>id.</u> § 542.18.  An inmate dissatisfied with the warden's response may appeal, using the BP-10 form, "to the appropriate Regional Director within 20 calendar days of the date the warden signed the response."  <u>See</u> <u>id.</u> § 542.15(a). Finally, an inmate dissatisfied with the Regional Director's response may appeal that response, using the BP-11 form, to the BOP's General Counsel in the Central Office "within 30 calendar days of the date the Regional Director signed the response."  <u>See</u> <u>id.</u>  The General Counsel's response is due within twenty (20) calendar days; however, the time period for response may be extended by twenty (20) days.  <u>See</u> <u>id.</u> § 542.18.

### 3.   Defendants' Factual Record Regarding Exhaustion

The BOP's computerized record of Crumble's administrative remedy submissions shows that he filed twenty-eight (28) administrative remedies.  (Doc. No. 24 ¶ 5.)  Of those twenty-eight (28) administrative remedies, only four (4) reached the Central Office.  (Id. ¶ 6.)  None of the four (4) involved the allegations contained in Crumble's complaint in this case.  (Id. ¶¶ 7–12.)  There was one administrative remedy, No. 1113559, which was received on March 15, 2022, and related to "Medical/COVID complaint."  See (id. ¶ 10).  Crumble apparently appealed from the Warden's response to his administrative remedy, but he did so to the Central Office instead of the Regional Director.  (Id. ¶ 11.)  The Central Office rejected the appeal on August 19, 2022, because it was improperly filed there.  (Id.)  Crumble never filed an appeal to the Regional Director.  (Id. ¶ 12.)

### 4.   Analysis

Defendants advised Crumble in their statement of material facts that, "pursuant to Local Rule 56.1, all facts set forth in [their] statement [would] be deemed admitted unless controverted by [Crumble] with references to the record supporting his position." (Doc. No. 24 at 1.)  Crumble never responded to Defendants' statement of acts.  As such, those facts are deemed admitted for purposes of the motion for summary judgment.  See M.D. Pa. L.R. 56.1.  This record shows that Defendants are entitled to judgment as a matter of law on Crumble's Bivens Eighth Amendment claims against them in the individual capacities because of his failure to fully exhaust his administrative remedies.  To the extent that there is evidence in the record suggesting that Crumble ever filed a formal administrative remedy relating to the events outlined in his complaint, the evidence also shows that he never fully exhausted any such administrative remedy by properly appealing to the Central Office.

The Court recognizes that in his complaint, Crumble avers that he "has exhausted his administrative remedies with respect to all claims," as well as that both Sage and Kubicki denied his requests for BP-9 forms.  <u>See</u> (Doc. No. 1 at 7).  Therefore, he appears to allege that he both fully exhausted his administrative remedies and that any remedies were unavailable to him because he could not obtain BP-9 forms.  Nevertheless, despite being faced with a motion for summary judgment and Defendants' admonition that he needs to respond to their statement of material facts or risk those facts being deemed admitted for purposes of the motion, Crumble has not submitted any evidence, via affidavit, declaration, or any other statement made under the penalty of perjury to support any allegation that the administrative remedy process was unavailable to him.  As such, the record does not support a finding that the administrative process was unavailable to him.  To the contrary, the record shows that Crumble had full and ready access to the administrative process and filed 28 administrative remedies while in BOP custody.  Accordingly, Crumble's failure to exhaust his available administrative remedies properly and fully prior to filing this action would entitle this Court to enter summary judgment in Defendants' favor.

### F.    Leave to Amend

Having determined that all claims against Defendants in the complaint are subject to dismissal, the Court turns to whether to grant Crumble leave to file an amended complaint. Courts should generally give leave to amend but may dismiss a complaint with prejudice where leave to amend would be inequitable or futile.  <u>See</u> <u>Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.</u>, 482 F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile.");  <u>see also</u> <u>Grayson v. Mayview</u>

State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does <u>not</u> seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that [they have] leave to amend within a set period of time, unless amendment would be inequitable or futile.").  "In determining whether [amendment] would be futile, the district court applies the same standard of legal sufficiency as [it] applies under Fed. R. Civ. P. 12(b)(6)."  <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1434 (3d Cir. 1997).

Here, the Court will not grant Crumble leave to amend because doing so would be futile. Although the Court is dismissing without prejudice Crumble's FTCA claim for the failure to exhaust his administrative remedies prior to filing the complaint in this case, Crumble cannot cure this defect with an amended complaint.  <u>See</u> <u>Holton I</u> at *8 ("The Third Circuit has held that an amended complaint filed <u>after</u> exhaustion does not cure lack of jurisdiction if the original complaint seeking tort damages under the FTCA was filed before exhaustion." (citation omitted)).  As for Crumble's <u>Bivens</u> claims, he cannot cure the jurisdictional defect with his official capacity claims, and there is no <u>Bivens</u> remedy for his Eighth Amendment claims or any possible First Amendment retaliation claim.  Accordingly, the Court will not grant Crumble leave to amend.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will (1) deny Plaintiff's motion to stay; (2) grant Defendants' motion to dismiss the complaint; (3) dismiss without prejudice Plaintiff's FTCA claims against the United States; (4) dismiss without prejudice Plaintiff's Eighth Amendment <u>Bivens</u> claims against Defendants in their official capacities; (5) dismiss with prejudice Plaintiff's Eighth Amendment <u>Bivens</u> claims against Defendants in their individual capacities; (6) deny as moot Defendants' motion for summary judgment; (7) deny as moot

37

Plaintiff's motion to appoint counsel; and (8) decline to provide Plaintiff with leave to file an amended complaint.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania